**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4882-16T3
                A-5687-16T3


STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DIOR K. SLADE,

      Defendant-Appellant.

_____

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

DAVID A. PEREZ, a/k/a DAVID
ASHTON PEREZ, III,

      Defendant-Appellant.

_____

Submitted November 14, 2018 – Decided December 28, 2018

Before Judges Hoffman and Suter.

On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 13-12-1474.

Law Offices of Proetta & Oliver, attorneys for appellant Dior K. Slade (William A. Proetta, on the brief).

Mazraani & Liguori, LLP, attorneys for appellant David A. Perez (Joseph M. Mazraani, of counsel and on the brief).

Andrew C. Carey, Middlesex County Prosecutor, attorney for respondent (Nancy A. Hulett, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

In these back-to-back appeals, which we now consolidate for purposes of this opinion, defendants Dior Slade and David Perez entered global pleas resolving two pending indictments involving a string of robberies. They now appeal from the order denying their motions to suppress evidence. In addition, each defendant also asserts a claim of sentencing error. We affirm in all respects in both appeals.

I.

This case arises out of a string of robberies committed at pizza restaurants and a robbery of a pizza delivery driver in June and July 2013. In December 2013, a Middlesex County grand jury returned an indictment charging defendants with thirty-one crimes including robbery, conspiracy, unlawful

possession of a weapon, and possession of a weapon for unlawful purposes. In addition, a Monmouth County grand jury returned an indictment charging defendants with armed robbery, possession of a weapon for an unlawful purpose, and unlawful possession of a weapon. The cases were consolidated in Middlesex County. On April 25, 2016, the trial judge denied defendants' joint motion to suppress evidence seized from Slade's BMW on the night of their arrest.

Following the denial of the suppression motion, both defendants accepted plea offers and entered guilty pleas. Slade pleaded guilty to one count of second-degree conspiracy to commit armed robbery and five counts of first-degree robbery. In accordance with his plea agreement, he received concurrent ten-year sentences with an eighty-five percent parole disqualifier.

Perez pleaded guilty to two counts of first-degree robbery and one count of third-degree unlawful possession of a weapon. In accordance with his plea agreement, he received an eight-year sentence with an eighty-five percent parole disqualifier.

On appeal, Slade and Perez raise the following identical points of arguments:

I. The trial court erred when it denied defendant's motion to suppress.

> A. The trial court erred in not suppressing the evidence because the stop of the BMW was illegal.

<span>A-4882-16T3</span>

i. The trial court erred in denying the suppression motion because the roadblock was illegal.

ii. The trial court erred in denying the suppression motion because the investigative stop of the BMW was illegal.

iii. The trial court erred in denying the suppression motion because the careless driving stop was pretextual and there was no reasonable suspicion to support "careless driving," therefore the stop was illegal.

iv. The trial court erred by denying the suppression motion because the fact that Perez had an outstanding warrant did not justify the stop therefore the stop was illegal.

B. The trial court erred by failing to suppress the evidence because no probable cause supported Slade's de facto arrest.

C. The trial court erred in not suppressing the evidence because Slade's BMW was towed by police without probable cause.

II. The trial court erred by failing to find adverse inferences as a result of the State's failure to produce evidence.

A. The trial court erred in not finding an adverse inference against the State because relevant MVR and radio transmissions were not turned over to the defense.

B. The trial court erred by failing to hold the missing documents and document irregularities give rise to an adverse inference.

i. The trial court erred by failing to find an adverse inference in Krzywdzinski's missing notes.

ii. The trial court erred in failing to find adverse inferences as a result of the missing documents regarding Krzywdzinski's vehicle.

A-4882-16T3

iii. The trial court erred in failing to find adverse inferences as a result of the discrepancies in the Sergeant's report.

iv. The trial court erred in failing to find adverse inferences resulting from the discrepancies in different versions of Weiss's report.

v. The trial court erred in failing to find adverse inferences as a result of the failure to turn over and the discrepancies in the fuel log.

vi. The trial court erred in failing to find adverse inferences as a result of the discrepancies in the CAD report.

III. The trial court erred when it failed to make factual and credibility findings.

A. The trial court erred when it failed to find that the state's witness were not credible.

i. The trial court erred in failing to make factual and credibility findings regarding Krzywdzinski's testimony.

ii. The trial court erred by failing to make factual and credibility findings regarding the roadblock and reason for the stop.

iii. The trial court erred by failing to consider the conflicting testimony about what occurred at the scene of the stop.

iv. The trial court erred by failing to consider the missing MVR and radio transmissions.

v. The trial court erred by failing to consider the credibility of Krzywdzinski's testimony regarding the clothing in the BMW.

5

vi. The trial court erred in failing to consider the conflicting testimony regarding the BB gun.

vii. The trial court erred in failing to consider the conflicting testimony regarding cell phones.

viii. The trial court erred in failing to consider the discrepancies in the police report.

In addition, Slade raises the following arguments in his appeal:

I.    D. The trial court erred in not suppressing evidence because the BMW was illegally searched at the scene.

IV. The trial court erred by sentencing defendant in the first-degree range.

And Perez raises the following additional point of argument in his appeal:

IV. The sentencing court erred in considering inappropriate information, requiring a remand for resentencing.

II.

We begin by summarizing the evidence from the suppression motion, which is set forth in greater detail in the trial court's written statement of reasons. Detective Michael Blahota of the Old Bridge Township Police Department first became suspicious of defendants following a March 2013 robbery of a Sunoco gas station in Old Bridge, where Perez previously worked. Det. Blahota suspected defendants because of conversations with the victim and her gas station manager, and watching a surveillance video. The victim of the robbery

A-4882-16T3

described the perpetrator as a "white male," between five feet, eight inches and five feet, ten inches tall, with a handgun in his right hand, wearing work boots.

The Sunoco manager told Det. Blahota that he suspected Slade "was responsible for that robbery" and for two prior robberies. While Slade did not appear to match the description of the alleged perpetrator, his car – a blue four-door BMW – was seen at the gas station at the time of the robbery. Defendants were never charged with any of the gas station robberies.

On July 18, Det. Blahota learned of two armed robberies in Sayreville via a TRAX message[1] sent out by the Sayreville Police Department. Both robberies took place at pizza restaurants, one at a Domino's on June 30, and the other at a Papa John's on July 14. The message indicated that during one of the robberies "a Sunoco gas station shirt was worn." The Sunoco shirt, plus the image attached to the TRAX message, reminded Det. Blahota of the armed robbery of the gas station four months earlier. Det. Blahota thought the TRAX image "maybe . . . resembled" Slade. The message described the suspect as five feet, eight inches tall and weighing either 160 or 185 pounds. Slade's height is five

---

[1] A TRAX message is a correspondence sent through an email system used by police departments to relay information and images concerning cases.

feet, ten inches and his weight is 140 lbs. Photos attached to the TRAX message also showed a vehicle – a white Ford Escape.

Det. Blahota then drove to Perez's house and discovered his sister drove a white Ford Escape. On July 28, 2013, a third armed robbery occurred at a Domino's in Old Bridge. A surveillance camera video showed the suspect wore a "gray long-sleeved shirt with a hood and some buttons down the front" along with "either a dark blue or black hat which appear[ed] to be inside out with a tag on top," and he was holding "a black handgun in his left hand." The suspect also wore "white and black high-top sneakers with black laces" and had pulled a "mask" or "hood" over his face. According to Det. Blahota, the hat and sneakers "appeared to be similar" to the items worn by the suspect in TRAX message photographs sent out by Sayreville police as a result of the robberies in their town.

Det. Blahota then drafted his own TRAX message, which he sent out July 30. The message stated the Domino's restaurant "was robbed by the same suspect as recent robberies in Sayreville and North Brunswick," and described the suspect as holding a black handgun in his left hand. He also posted the message in the patrol room of the Old Bridge Police Department.

A-4882-16T3

On July 29 and 31, Det. Blahota drove past defendants' homes and saw a white Ford Escape at Slade's home. On July 31, Det. Blahota saw Perez get into a blue BMW with Slade driving. Det. Blahota decided to follow the BMW in his unmarked police vehicle. Det. Blahota followed the car for a while, but stopped because it would have "been obvious" that he was following them.

Eventually, Det. Blahota saw the blue BMW drive "extremely slow" in front of a Papa John's restaurant, and it appeared to him the passengers were looking "right at the Papa John's store." Det. Blahota watched the vehicle for about thirty minutes before leaving when his shift ended.

Back at headquarters, Det. Blahota informed Sergeant Nitto[2] of his observations and that he had a "hunch" but no "concrete evidence" that a robbery would occur there. Det. Blahota also notified Sgt. David Mauro of the Aberdeen Township Police Department of what he saw.

The Papa John's was not robbed that night; however, a Domino's delivery driver was robbed between 11:00 and 11:15 p.m. that evening. Sgt. Nitto informed Det. Blahota of the robbery and advised him "the description was similar to that of Mr. Slade and Perez."

---

[2] Sgt. Nitto's full name does not appear in the record.

A-4882-16T3

Old Bridge Police Officer Michael Krzywdzinski was scheduled to work until 2:30 a.m. the next morning. He knew of the pizza store robberies and had reviewed the TRAX messages concerning the robberies. Around 11:00 p.m., Ofr. Krzywdzinksi learned of the armed robbery through Info-Cop, a police instant messaging system. The message stated there were two robbers, wearing ski-masks and armed with a black handgun, who approached the driver on foot and fled on foot as well.

Ofr. Krzywdzinksi drove to the intersection of Amboy Road and Disbrow Road, near where Perez lived. He also learned Perez had an outstanding warrant for his arrest for an unrelated matter.

About an hour after Ofr. Krzywdzinksi arrived at the intersection, he saw a blue BMW drive down Amboy Avenue and make a left turn onto Disbrow Road. Ofr. Krzywdzinksi also observed the BMW cross over the double yellow lines that separated Amboy Avenue, and stop beyond the white stop line at a stop sign. The BMW then turned and parked.

At that point, Ofr. Krzywdzinksi decided to conduct a motor vehicle stop, and pulled his car perpendicular to the BMW. As he stopped his patrol car, he noted the vehicle's license plate number, which he recognized from the Info-Cop chat. Ofr. Michael Pizza arrived within seconds.

Ofr. Krzywdzinksi approached the BMW from the passenger side. He recognized Perez in the passenger seat and ordered him out of the vehicle. Ofr. Krzywdzinksi then placed Perez under arrest based on his outstanding warrant and conducted a search of Perez's person. In Perez's pants pocket, he found a ski mask with holes, which resembled the mask described in the July 31 robbery.

Ofr. Krzywdzinksi then approached and opened the driver's side door. In the open door, the officer saw a white cell phone with a gray case in the door's pocket holder. He also noticed two cell phones in the center console. Ofr. Krzywdzinksi also noticed a grey shirt and sneakers that resembled the clothing described in the TRAX messages.

Defendants were arrested and taken to Aberdeen police headquarters, along with the BMW, where officers completed a consent search of the car after both Slade and his mother – who owned the BMW – signed written consent forms. The search produced a BB gun found in the glove compartment.

### III.

When reviewing a judge's ruling on a suppression motion, the appellate court "must uphold the factual findings underlying the [judge's] decision so long as those findings are supported by sufficient credible evidence in the record." State v. Elders, 192 N.J. 224, 243 (2007) (citing State v. Locurto, 157 N.J. 463,

474 (1999)). We "give deference to those findings of fact of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the <u>feel</u> of the case, which a reviewing court cannot enjoy." <u>State v. Johnson</u>, 42 N.J. 146, 161 (1964). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995). We therefore review a trial court's conclusions of law with a de novo standard. <u>State v. Harris</u>, 181 N.J. 391, 419 (2004).

Defendants first challenge the motor vehicle stop. They advance several arguments, including that the stop constituted an illegal roadblock and an illegal pretext stop. In addition, they assert that Perez's outstanding warrant could not justify the stop. We address these arguments in turn.

Defendants first argue that Ofr. Krzywdzinski parking his vehicle perpendicular to Slade's to prevent him from leaving constituted an illegal roadblock, thereby leading to an illegal search. However, what occurred here was not a road block. <u>See</u> <u>Delaware v. Prouse</u>, 440 U.S. 648, 657 (1979) (describing a roadblock as a setup where "all vehicles are brought to a halt or near to a halt, and all are subjected to a show of the police power of the

A-4882-16T3

community"). Rather, what occurred here was Terry[3] stop. See State v. Davis, 104 N.J. 490, 497-98 (1986) (finding a Terry stop where a police officer blocked defendant's vehicle with his car to prevent him from leaving).

Defendants next challenge the legality of the stop by arguing the police did not have "reasonable suspicion to support 'careless driving.'" Rather, defendants contend Det. Blahota's hunch was the only basis to stop Slade's vehicle.

To justify an investigative stop, police need reasonable and articulable suspicion of criminal activity or a motor vehicle infraction. Terry, 392 U.S. 1. The State must prove that particular facts provide reasonable suspicion for the stop. State v. DeLorenzo, 166 N.J. Super. 483, 488 (App. Div. 1979).

The trial judge rejected this argument, because "not only did the defendants' vehicle cross the double yellow lines but it also failed to come to a complete stop at the white line of the '[s]top' sign at the intersection on Disbrow Road; and a traffic summons was issued as a result." The judge made a specific finding that "Ofr. Krzywdzinski's testimony about observing the traffic violation was credible." We conclude the record supports the judge's determination that

_____

[3] Terry v. Ohio, 392 U.S. 1 (1968).

A-4882-16T3

Ofr. Krzywdzinski had "sufficient reasonable suspicion to stop the defendants' vehicle."

Defendants next argue that the stop was illegal because it was merely a pretext based on Det. Blahota's suspicions related to the robberies. Accepting defendant's assertion as true, a pretextual stop is not automatically invalid. An otherwise valid stop is not deemed invalid because the stop was pretextual. Whren v. United States, 517 U.S. 806, 813 (1996). Because, we find the stop was supported by reasonable suspicion of a motor vehicle violation, Ofr. Krzywdzinski's alleged pretext does not require suppression.

Defendants further argue the police did not have probable cause to tow the BMW and therefore seek the suppression of any evidence uncovered during the search of the vehicle. Police may only seize a motor vehicle if there is probable cause to believe the vehicle contains evidence of a crime. Chambers v. Maroney, 399 U.S. 42 (1970). Here, probable cause existed.

Simply the fact that the BMW was pulled over for a traffic violation gave the officer authority to ask Slade to exit the vehicle. See Pennsylvania v. Mimms, 434 U.S. 106 (1977) (holding an officer may ask a driver out of the car during a motor vehicle stop). The authority to ask a driver out of the vehicle includes the right to open the door. State v. Mai, 202 N.J. 12, 22-23 (2010).

A-4882-16T3

Ofr. Krzywdzinski testified that through the open door, he saw a third cell phone in a vehicle with only two occupants. He also saw in plain view clothing that matched the description of that worn during a previous robbery.

It has been consistently held "that a principal component of . . . probable cause . . . 'is a well-grounded suspicion that a crime has been or is being committed.'" State v. Moore, 181 N.J. 40, 45 (2004) (quoting State v. Nishina, 175 N.J. 502, 515 (2003)). The ski mask, plus clothing and sneakers in plain sight that matched the description of the robbery, plus a third cell phone in a car occupied by two people when the robbers also took the victim's cell phone, gave Ofr. Krzywdzinski probable cause to believe that the BMW contained evidence of a crime. Thus, the police did not wrongfully tow Slade's vehicle.

Slade argues the police lacked probable cause to place him under arrest, and therefore any evidence against him should have been suppressed. An officer must have either a warrant or probable cause in order to arrest a suspect. See State v. Henry, 133 N.J. 104, 110 (1993). As noted, probable cause is a reasonable belief that a crime has been or is being committed. State v. Burnett, 42 N.J. 377, 386 (1964). Whether probable cause existed depends on the totality of the circumstances, looked at from an objective viewpoint. Illinois v. Gates, 462 U.S. 213, 238 (1983).

A-4882-16T3

Here, Perez, a passenger in Slade's vehicle, was properly arrested pursuant to an outstanding warrant. While searching Perez pursuant to his arrest, Ofr. Krzywdzinski found a ski mask in the right pocket of Perez's cargo pants. The Info-Cop message about the robbery stated the suspects were wearing ski masks. Further, Ofr. Krzywdzinski noticed three cell phones in a vehicle occupied by two people. Ofr. Krzywdzinski also noticed clothing inside the vehicle that matched that worn by the suspects and saw a pair of black and white Nike sneakers similar to that worn by the suspects. While none of these facts alone would support a finding of probable cause, when combined, they fully support a finding of probable cause.

Defendants further argue the police illegally searched the BMW at the time of the stop. As the trial court pointed out, defendants presented no testimony or physical evidence that any officer entered the vehicle or observed a fellow officer entering the vehicle at the scene. Defendants failed in any way to show that the police searched the vehicle at the scene. The transcript cites relied upon by defendants in support of their argument involve questions to witnesses about a gun being found "at the scene" and no question specifically mentions a search of the vehicle. Further, each witness denied a gun was ever found at the scene. Accordingly, the trial court did not err in rejecting

16

defendants' claims that police illegally searched the BMW at the scene of the stop before obtaining written consent for the vehicle search.

Additionally, defendants argue the trial court erred in failing to find adverse inferences against the State based upon failure to produce evidence, namely, relevant Motor Vehicle Recordings, radio transmissions, vehicle documents, and police reports. Defendants assert the trial judge never addressed these arguments.

However, it is the parties' "responsibility to refer us to specific parts of the record to support their argument." Spinks v. Township of Clinton, 402 N.J. Super. 465, 474 (App. Div. 2008). Defendants fail to show exactly where these arguments were raised below. Defendants also claim they won a discovery motion compelling the production of missing documents and recordings, but do not provide the order. As such, we decline to address defendants' arguments. Likewise, for the same reasons we decline to address defendants' arguments that the trial court failed to make credibility determinations and to reconcile conflicting testimony.

IV.

Defendants both argue they received improper sentences despite receiving sentences in accordance with their plea agreements. These arguments lack merit.

A.

Perez argues the sentencing judge considered inappropriate information in issuing his sentence. Perez points out that the judge stated a lot of people spoke to the court or wrote letters on his behalf, and argues the judge found this as an aggravating factor. This is an incorrect reading of the transcript. While the judge did note the effort his family and friends made to support him, the record does not reflect the judge counted this support against Perez. The judge merely noted that most defendants who come before him do not have the benefit of a large support network.

Perez also argues the judge improperly considered the charges against him that had been dismissed. "The reduction or dismissal of charges under a plea agreement . . . are not 'aggravating' factors under the Code that may be considered in arriving at [a] sentence." State v. Sainz, 210 N.J. Super. 17, 28 (App. Div. 1986).

A-4882-16T3

The judge did state, "I know he did not plead to – he only pled to two separate incidents, but I [cannot] ignore the fact that he was charged with six separate robberies." However, the judge only used it to explain his finding that defendant was a risk to commit future crimes. Further, the sentence defendant received was in accordance with his favorable plea agreement.

B.

Slade argues that because the court found only one aggravating factor and four mitigating factors, the mitigating factors outweighed the aggravating factors and his sentence therefore should have been downgraded to that of a second-degree crime. This argument lacks merit.

A downgraded sentence is suitable when the court is "clearly convinced that the mitigating factors substantially outweigh the aggravating factors and where the interests of justice" require the sentence. N.J.S.A. 2C:44-1(f)(2). Here, the sentencing judge found aggravating factor nine applied and that mitigating factors six, seven, nine, and twelve also applied. However, the judge found that aggravating factor nine, the need to deter, weighed "very, very heavily" in this case.

Regardless, Slade made no attempt to argue that the interest of justice required downgrading his sentence; instead, he merely argues that because the

A-4882-16T3

judge found more mitigating factors than aggravating factors his sentence should have been downgraded. However, this is not the test. See State v. L.V., 410 N.J. Super. 90, 107 (App. Div. 2009) (the sentencing decision follows from a qualitative, rather than a quantitative analysis.). The severity of Slade's crimes and the number of them weighed in favor of a sentence within the first-degree range. Defendant received a very favorable plea agreement that resulted in an aggregate sentence of ten years in prison for committing five first-degree robberies. Accordingly, the sentencing judge did not err in imposing defendant's sentence.

To the extent we have not addressed any argument raised by defendants, we deem such arguments lacking in sufficient merit to warrant comment in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4882-16T3